CANAL NATIONAL BANK, ET AL.
*vs.*
SCHOOL ADMINISTRATIVE DISTRICT NO. 3, ET AL.

Waldo.   Opinion, October 14, 1964.

*Roger A. Putnam, Esq.,* for Plaintiff.

*George A. Wathen, Esq.,*
*Judson Jude, Esq.,*
*David A. Nichols, Esq.,*
*Richard J. Dubord, Esq.,*
*John W. Benoit, Esq.,* for Defendants.

SITTING: WILLIAMSON, C. J., TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ.  WEBBER, J., did not sit.

DISSENT: TAPLEY, SULLIVAN, JJ.

WILLIAMSON, C. J.   On appeal.   The plaintiff banks are holders of bonds issued by School Administrative District No. 3 (SAD No. 3).  The defendants are SAD No. 3, its officers and directors, the inhabitants of the eleven constituent towns, the State Board of Education and its members, the Commissioner of Education and the Attorney General.  The plaintiffs sought and obtained a declaratory judgment holding P. & S. L., 1963, c. 175, "An Act to Provide for the Reorganization of School Administrative District

No. 3" (the 1963 Act) by which Liberty, Brooks and Monroe (the "three towns" or "the withdrawn towns") the appellants, were removed from SAD No. 3, unconstitutional and void in that it impaired the obligation of the bonds, and also injunctive relief to prevent action under the 1963 Act.

The bonds in question were part of a $730,000 issue duly authorized under the statutes relating to school administrative districts. R. S., c. 41, § 111-K. References to sections are to R. S., c. 41 unless otherwise indicated. The residents of and the territory within the eleven towns of Brooks, Freedom, Jackson, Knox, Liberty, Monroe, Montville, Thorndike, Troy, Unity and Waldo comprised "the body politic and corporate" (Sec. 111-F) known as SAD No. 3 when the bonds were issued and there has been no change in this respect apart from the 1963 Act.

The decisive issues are: (1) Does the 1963 Act impair the obligation of the bonds, and (2) if so, may the provisions relating to operation of schools be severed from the offending provisions and given effect?

The position of the three withdrawn towns that the plaintiff banks were neither holders in due course of the bonds nor creditors of the district entitled to a declaratory judgment is without merit. The record shows the bonds were duly authorized and issued under the laws then existing. Bond counsel in their legal opinion incorrectly stated that each bond should bear the authenticating certificate of Bank A, when in fact Bank B, duly authorized, authenticated the bonds. The validity of the bonds, and the rights of the plaintiffs to proceed with their complaint do not turn, as the three withdrawn towns suggest, on such an inconsequential error.

We turn to the constitutionality of the 1963 Act. (1) What was the obligation of bonds, i.e., the contract?

(2) What changes in the bonds were made by the 1963 Act?
(3) Did the changes impair the obligation of the bonds?
(4) If so, may the bad be severed from the 1963 Act and the remainder be given effect?

I. *The Bonds*

The bonds in question, $730,000 in amount, payable $35,000 each year from 1964 through 1983, and $30,000 in 1984, were authorized and issued under Sec. 111-K. They were issued "to procure funds for capital outlay purposes," were within the applicable debt limit, and were "in such form subject to sections 111-A to 111-U-1 . . . ," that is to say, the sections relating specifically to school administrative districts. "Said . . . bonds . . . shall be legal obligations of said district, which is declared to be a quasi-municipal corporation within the meaning of Chap. 90-A, § 23, and all the provisions of said section shall be applicable thereto." The bondholder is thus given the right on judgment against the district to levy on all personal property of the residents of and on all real estate within the district. For convenience we may sometimes refer to this right as the right to direct levy. R. S., c. 90-A, § 23, as amended, reads:

> "The personal property of the residents and the real estate within the boundaries of a municipality, village corporation or other quasi-municipal corporation may be taken to pay any debt due from the body corporate. The owner of the property so taken may recover from the municipality or quasi-municipal corporation under section 32 of chapter 118."

See also R. S., c. 118, §§ 30, 31 and 32, as amended.

Section 111-L provides for the financing of school administrative districts. It is not necessary that we review the steps in preparation and approval of the annual budget. For our purposes it is sufficient to note that by mandate of the Legislature the amount required for payment of bonds

falling due and interest shall be included in the total assessment for all purposes, including operational expenses and debt service.

The assessors of each participating municipality are required annually by warrant of the directors of the district "to assess upon the taxable polls and estates within said municipality an amount in proportion to the total sum required each year as that municipality's state valuation bears to the total state valuation of all the participating municipalities," and to commit the assessment to the tax collector. Available gifts and trust funds may be used to reduce the assessment in any municipality. The town treasurer "shall pay the amount of the tax" within stated times to the district. On failure to pay there is a mandatory provision for "levy by distress and sale on the real and personal property of any of the residents of said administrative district living in the municipality where such default takes place."

We have discussed the statutory provisions relating specifically to capital outlay bonds, such as the bonds held by the plaintiff, in some detail that we may see the insistence of the Legislature on the payment of the bonds and interest through taxation.

In brief, the bonds when issued were the legal obligation of SAD No. 3, a quasi-municipal corporation, comprising the residents of and territory within eleven participating municipalities, with payment by SAD No. 3 secured through taxation within each municipality on a proportional basis and with payment further secured by the right of the bondholder ultimately to levy on the personal property of the residents and the real estate within the entire district.

II. *The 1963 Act*

The Act may be summarized as follows:

SAD No. 3 is reorganized to comprise eight towns. The Towns of Liberty, Brooks and Monroe "are removed and

withdrawn" from SAD No. 3 and "from the effective date of this act shall revert to their prior status as independent municipalities for all school and educational purposes . . ." Sec. 1. The towns comprising SAD No. 3 as reorganized are constituted SAD No. 3 and all proceedings in the eight towns relating to the eleven town SAD No. 3 are validated under Sec. 2.

We do not concur with the view of the single justice that SAD No. 3 was dissolved and a new SAD No. 3 created. The intent of the Legislature in our opinion is that SAD No. 3 should be reorganized without loss of its corporate body. The purpose of the Act is to detach the residents of and the territory within the three withdrawn towns from SAD No. 3, to restore responsibility for education to the three towns, and to adjust property and contract rights and obligations equitably among SAD No. 3 and the departing towns. See for example Sec. 4 — responsibility for education; Sec. 5 — payments by towns removed; Sec. 6 — distribution of property to towns removed; Sec. 7 — teachers' contracts; Sec. 11 — arbitration between SAD No. 3 and school committees of withdrawn towns.

Sec. 10 of the Act quoted below specifically affects and alters the statutes touching the bonds. It must be considered of course with other sections of the Act and in particular with Sec. 1 and Sec. 2 whereby SAD No. 3 was reduced from eleven to eight towns.

> **"Sec. 10. School Administrative District No. 3, as reorganized, bond issue validated.** The prior action relative to school construction and the issuance of $730,000 in bonds or notes is hereby declared to be valid and effective, any provisions of the law to the contrary notwithstanding, and any bonds or notes issued thereunder are hereby deemed to be a valid and binding indebtedness of School Administrative District No. 3 as herein reorganized, provided however that said bonds or

notes shall in no way be construed as an indebtedness or liability of any of the Towns of Liberty, Brooks or Monroe, except as a contingent liability in the event of default on said bonds or notes if payment in full of the same is not made after levy on all of the assets of said School Administrative District No. 3, as hereby reconstituted, in accordance with the terms and conditions of said notes and bond indenture, and said contingent liability shall be in the same proportion as it would have been had the Towns of Liberty, Brooks and Monroe remained within School Administrative District No. 3 prior to its reorganization."

Under the proviso a contingent liability "if payment in full of the same [meaning the bonds] is not made after levy on all of the assets of . . . [the eight town SAD No. 3]," is placed upon the three withdrawn towns. This liability, in our view, is in full substitution (1) for the power and duty of SAD No. 3 hitherto to raise by taxation within the three towns a proportionate share of the bonds falling due and interest, and (2) for the unlimited right of the bondholder on judgment against SAD No. 3 to levy directly on property within the towns. Thus the bondholder under Sec. 10 with reference to the three withdrawn towns retains only the right of direct levy after exhaustion of all of the assets of the eight town SAD No. 3. "Assets" in this context we construe to mean the personal property of the residents and the real estate within the boundaries of the eight town SAD No. 3. The Legislature did not refer simply to property owned by SAD No. 3 and not used for public purposes.

The argument that Sec. 10 strengthens the position of the bondholders by creating liability against the three towns where none existed before is not convincing. From issuance, the bonds were obligations of a school administrative district, not of the participating municipalities. The Legislature did not intend to create town debts upon the bonds

and so use the borrowing power of the town within the town's debt limit to meet district obligations.

With the exhaustion of all of the property within the reorganized SAD No. 3, before levy within the three withdrawn towns, the right to levy — that is, the "contingent liability" — becomes without value. As a practical matter, how could a bondholder levy on all of the personal property of the residents and all of the real estate within the eight town district? Or, as a practical matter, how could he prove that he had so levied? The purpose of the direct levy is to provide a certain and effective method of obtaining payment of a debt against, as here SAD No. 3, a quasi-municipal corporation.

On issuance of the bonds, the bonds were secured (1) by the power to tax eleven towns, and (2) by the right of the bondholder to levy on property within eleven towns. Under the 1963 Act, the bonds are secured (1) by the power to tax only the eight towns of the reorganized district, and (2) by the right of the bondholder to levy on property within the eight towns. The contingent liability against the three withdrawn towns is hemmed with such conditions as to be without practical benefit to the bondholder.

III. *Constitutionality*

We turn to the question whether the 1963 Act impaired the obligation of the bonds.

"The legislature shall pass no bill of attainder, *ex post facto* law, nor law impairing the obligation of contracts, . . "
Constitution of Maine, Article I, Section 11.
"No State shall, . . pass any . . . law impairing the obligations of contracts . . . "
United States Constitution, Article I, Section 10.

The governing principle was stated by Chief Justice Fellows in *Baxter* v. *Waterville Sewerage District*, 146 Me. 211, 79 A. (2nd) 585. The court said, at p. 214:

"In passing upon the constitutionality of any act of the Legislature the court assumes that the Legislature acted with knowledge of constitutional restrictions, and that the Legislature honestly believed that it was acting within its rights, duties and powers. All acts of the Legislature are presumed to be constitutional and this is 'a presumption of great strength.' *State v. Pooler*, 105 Me. 224, 228; *Laughlin v. City of Portland*, 111 Me. 486; *Village Corporation v. Libby*, 126 Me. 537, 549. The burden is upon him who claims that the act is unconstitutional to show its unconstitutionality. *Warren v. Norwood*, 138 Me. 180. Whether the enactment of the law is wise or not, and whether it is the best means to achieve the desired result are matters for the Legislature and not for the court. *Kelley v. School District*, 134 Me. 414; *Hamilton v. District*, 120 Me. 15, 20."

The laws existing at the making of a contract form part of the contract. Sec. 111-K on borrowing and Sec. 111-L on financing the payment of the bonds and interest by taxation were part of the contract of the bonds.

" . . . the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement . . . "
*Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550.

"[The remedies for the enforcement of contractual] obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or, if they are changed, a substantial equivalent must be provided. Where the resource for the payment of the bonds of a municipal corporation is the power of taxation existing when the bonds were issued, any law which withdraws or limits the taxing power, and leaves no adequate means

for the payment of the bonds, is forbidden by the constitution of the United States, and is null and void."

*Mobile* v. *Watson,* 116 U. S. 289, 305, 6 S. Ct. 398, 405.

"Is there an impairment? In *Phinney v. Phinney,* 81 Me., 450, 17 A., 405, 407, while recognizing 'that a state to a certain extent and within proper bounds may regulate the remedy,' the court holds that 'if by subsequent enactment it so changes the nature and extent of existing remedies as materially to impair the rights and interests of a party in a contract, this is as much a violation of the compact as if it absolutely destroyed his rights and interests. The constitutional prohibition secures from attack not merely the contract itself, but all the essential incidents which render it valuable and enable its owner to enforce it.' Cited in the Phinney case is *Louisiana v. New Orleans,* 102 U.S., 206, with this quotation: 'The obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced, — by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of those means impairs the obligation. If it tend to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened.'

"Our Court then said, 81 Me., on page 462; 17 A., on page 407:

'The result arrived at in all the decisions, bearing upon this question, seems to be that the legislature may alter or vary existing remedies, provided that in so doing, their nature and extent is not so changed as materially to impair the rights and interests of parties to existing contracts.'

"In *Richmond Mortgage & Loan Corporation, Appellant v. Wachovia Bank & Trust Company et al.,* 300 U. S., 124, 57 S. Ct., 338, 81 Law Ed., 552, decided February 1, 1937, the Supreme Court stated

the applicable principle pertaining to impairment of a contract by modification, limitation, or alteration of the remedy as follows:

'The legislature may modify, limit or alter the remedy for enforcement of a contract without impairing its obligation, but in so doing, it may not deny all remedy or so circumscribe the existing remedy with conditions and restrictions as seriously to impair the value of the right.' "

*Waterville Realty Corp.* v. *City of Eastport*, 136 Me. 309, 313, 8 A. (2nd) 898.

We set aside cases illustrating the extent of change in remedy permissible in an emergency. See *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, the leading case upholding a mortgage foreclosure moratorium. In *Waterville Realty Corp., supra,* our court, in recognizing the principle of *Home Building & Loan Assn.,* held unconstitutional a municipal financial relief statute suspending, among other remedies, action on debts not limited to the period of emergency. In the instant case we find no suggestion of emergency — financial or otherwise — from which we may draw an analogy to the *Home Building & Loan Assn.* and *Waterville Realty* cases.

The high duty and wide authority of the Legislature to promote education has been the policy of our State since 1820. Constitution of Maine, Article VIII. Our court has said with approval in *Shaw* v. *Small,* 124 Me. 36, 40, 125 A. 496:

"Eminent courts hold that statutes relating to public schools should receive a liberal construction in aid of their dominant purpose which is universal elementary education."

It does not follow, however, that a law impairing the obligation of a contract for money borrowed or for capital outlay bonds as here, or for a teacher's salary, or for any other

valid contract within the field of education should escape more readily the bar of the Constitution.

The bondholders have no standing in matters of education. Their only rights relate to the bonds. They may not be heard, nor do they seek to be heard, on the redistribution of responsibility for education between SAD No. 3 and the three withdrawn towns.

In applying the law to the facts, we conclude that the 1963 Act impairs the obligation of the bonds and hence is unconstitutional under both the State and Federal Constitutions.

We base our holding on two grounds: first, in the destruction of the power of SAD No. 3 to tax within Liberty, Brooks and Monroe; second, in the virtual destruction of the right of the bondholder to levy on property within the three towns.

It is strongly urged that the detachment of three towns from SAD No. 3 with the loss of the power to tax is a change in remedy or means of enforcement of no substantial significance. The valuation of the remaining eight towns is said to be ample protection to the bondholders.

We are satisfied nevertheless that the loss by SAD No. 3 of the power to tax in any one of the eleven towns comprising SAD No. 3 when the bonds were issued impaired the obligation of the bonds. Each participating municipality in a school administrative district is of importance in determining the ability of a district to borrow and support its operations. See Sections 111-K and 111-L.

Towns grow and towns decline. Town A with the highest valuation in the district today may lose valuation both in fact and also in relation to the other towns over the years. The purchasers of the bonds of SAD No. 3 necessarily accept the risk of change within the towns and dis-

trict. They had the right by virtue of their contract to consider that certain conditions established by law would remain constant. Among these rights was the power of the district to tax within the eleven towns to raise money to meet its obligations.

The destruction of the power to tax as here on its face and without more, in our view, substantially reduces the security of the bonds and does not leave the bondholder with substantially equivalent remedies.

There will be on the one hand cases wherein town lines are redrawn, with the detachment of some taxable property, which no fair-minded man will consider more than a negligible change in remedy on, for example, school bonds. On the other hand, if a Legislature should take away from an entire district the power to tax to pay the bonds, thus destroying the ability of the district to meet the bonds, the law would clearly violate the contract clause.

The vital importance of the ability to tax is emphatically stated in *Paul* v. *Huse,* 112 Me. 449, 92 A. 520, by the court in holding that a village corporation had the right to levy necessary taxes by implication. The court said, at p. 450:

> "The right to borrow carries with it the obligation to pay, and as a municipality has no means of paying its indebtedness except by taxation it necessarily has this power. *State* v. *Bristol,* 109 Tenn., 315; *Wilson* v. *Florence,* 40 S. C., 426; *Charlotte* v. *Shepard,* 122 N. C. 602; *Slocomb* v. *Fayetteville,* 125 N. C., 362; *Lowell* v. *Boston,* 111 Mass., 454, 460; *U. S.* v. *New Orleans,* 98 U. S., 381. Any other interpretation would work a fraud upon the public who in good faith purchase the authorized bonds. A bond is itself evidence of indebtedness and an obligation to pay, and yet it is argued that while the legislature has authorized the issue and thereby permitted the corporation not only to borrow the money but to become legally indebted

therefor, it has failed to open the only avenue by which that indebtedness can be met. Such a position is untenable."

We are not prepared to accept the right of the bondholder to direct levy after judgment against SAD No. 3 as an adequate and sufficient remedy in absence of the taxing power. In the Opinion of the Justices of the Massachusetts Court, 9 N. E. (2nd) 189 (1937), the opinion was given that a constitutional limitation on the rate of municipal taxation would not impair the obligation of municipal contracts in light of the remedy available to the claimant to obtain judgment and levy on property. The opinion does not reach the present case in which the power to tax within a municipality is totally destroyed.

Second — The right of the bondholder to satisfy his judgment against the district by levy on personal and real property, as described, is security of the highest value for the bonds.

"It does not follow that every statute is the 'law of the land,' nor that every process authorized by a legislature is 'due process of law.' It must not offend against 'the established principles of private rights and distributive justice.' This statute does not. It does not transfer A's property to B. It only makes A's property liable to be taken for a debt, he in common with others, owes to B. A can save his property by paying the judgment against his town, which judgment binds him and all the other inhabitants, and is a judgment he, and each of the others ought to pay. Whether he pay or let his property be sold, he can recover full damages of the town, and have the same final process for the collection of his debt. In the end he only pays his rateable share of the common debt. The statute is general, and is uniform in its application, to every town, and every inhabitant. It may not be in theoretical harmony with other methods of procedure, but it accomplishes its laud-

able purpose, of compelling towns to pay their debts, without doing any injustice. Towns readily obtain credit at low rates of interest upon the strength of it, and to now pronounce it void, would destroy their credit and work wide spread disaster among those who have so confidently invested their savings in loans to towns."

*Eames* v. *Savage,* 77 Me. 212, 222.

Again as in the discussion of taxation, we are satisfied that the destruction (for the change by the 1963 Act amounts to this) of the right to levy in any one of the participating municipalities is sufficient on its face to establish that the remedy retained is not the substantial equivalent of the remedy lost.

The 1963 Act is intended by the Legislature to be a complete scheme for the distribution of educational and financial responsibilities among SAD No. 3 with eight towns and the three withdrawn towns. If the offending Sec. 10 is severed from the Act, the intent of the Legislature will not be carried out. Further provision to adjust in particular the impact of the bonds within the district without impairing the obligation of the bonds is required to satisfy the Constitution.

IV. *SAD No. 3 Cross Claim*

SAD No. 3 filed a cross claim seeking a declaratory judgment as to the rights, duties and liabilities of SAD No. 3 and the three withdrawn towns. The provisions of the 1963 Act relating to arbitration on failure to reach agreement on distribution of property among SAD No. 3 and the withdrawn towns (Sec. 11), and to the compulsory assignment of teachers' contracts (Sec. 7), are the particular subjects of attack.

We are not satisfied there is a genuine controversy over the 1963 Act in these respects. For the broad authority of the State over quasi-municipal corporations such as SAD

No. 3 and the transfer of their property for similar public purposes see *Kelley* v. *School District,* 134 Me. 414, 420, 187 A. 703.

No teacher has questioned Sec. 7. The thrust of this case is the obligation on the bonds. In our opinion justice will not be served by the consideration of questions which are unlikely to arise.

### V. *Summary*

By the 1963 Act an eleven town SAD No. 3 was reorganized as an eight town SAD No. 3. The power of the district to tax for payment of bonds and interest and the right of bondholders to satisfy a judgment against SAD No. 3 by levy on property throughout the eleven town district formed part of the contract on the bonds. The destruction of the power of the district to tax, or of the right of the bondholder to levy, in any one town of SAD No. 3 is an impairment of the obligation of the bond in violation of the contract clauses of the State and Federal Constitutions.

The substitute benefit to the bondholders under Sec. 10 of the 1963 Act falls far short of a remedy substantially equivalent to the remedies available on issuance of the bonds. Without suitable provisions for adjustment of liability on the bonds, the plan of reorganization of SAD No. 3 is incomplete and so the entire Act must be considered a nullity.

The entry will be

*Appeal denied.*

TAPLEY AND SULLIVAN, JJ., DISSENT:

The plaintiffs are two national banks. The defendants are School Administrative District No. 3, a quasi-municipal corporation, its constituent members who are the inhabi-

tants of eleven towns, its Superintendent, Secretary, Treasurer and directors, the State Board of Education and its Commissioner and the Attorney General.

In 1958 the School District became incorporated through compliance with the provisions of R. S., c. 41, §§ 111-A through 111-U and comprised the residents and the territories of nine municipalities, those of the towns of Freedom, Knox, Liberty, Monroe, Montville, Thorndike, Troy, Unity and Waldo. In 1959 by conformance with the permissive provisions of P. & S. L., chapters 1 and 2 the residents and the territory of the towns of Brooks and Jackson became assimilated into the School District. By P. & S. L., 1959, c. 221 the Legislature retroactively confirmed the School District with its eleven groups of residents and its eleven territories.

On April 8, 1963 the directors of the District competently voted and on June 10, 1963 issued, sold and delivered to underwriters $730,000 face value, capital outlay, debenture bonds of the District.

On June 13, 1963 the Legislature enacted P. & S. L., 1963, c. 175 to become effective September 21, 1963 and operative within the School District on October 1, 1963. That law disjoined the residents and territories of the towns of Liberty, Brooks and Monroe from the School District, reorganized the District to retain the other, eight groups of residents and territories and prescribed detailed directions for reconciling the resultant consequences of the rupture.

The plaintiffs on June 10, 1963 by purchase had acquired some of the District bonds. As owners of the bonds and pursuant to the provisions of R. S., c. 107, §§ 38 to 50, inc., the Uniform Declaratory Judgments Act, the plaintiffs on September 3, 1963 instituted a complaint asserting that P. & S. L., 1963, c. 175 is violative of the impairment of contract prohibitions of the Maine and United States Con-

stitutions and requesting an affirmative judgment to that effect with concomitant injunctive relief.

The cause was heard by a justice who sustained the complaint and enjoined the implementation of P. & S. L., 1963, c. 175.

Some defendants appeal to this court from such judgment.

The presiding justice in his decision ruled that the bonds issued by the School District are valid, that the plaintiffs are holders in due course of some of the bonds and that the plaintiffs in this action are rightfully in court.

We quote further findings and rulings of the justice:

"The Legislature in 1963 enacted Ch. 175 of the Private and Special Laws of Maine, which Act became effective on September 21, 1963. This Act entitled 'An Act to Provide for the Reorganization of School Administrative District No. 3' in effect dissolves School Administrative District No. 3 as originally constituted, removes and withdraws the Towns of Liberty, Brooks and Monroe therefrom, and constitutes and establishes a new School Administrative District No. 3 comprising territorially only the eight remaining towns. The Act provides that as of October 1, 1963 the entire responsibility for the education of pupils in the three removed towns will vest in those towns and in each town a newly elected Superintending School Committee will perform all of the necessary duties. The property of School Administrative District No. 3 as originally constituted which is located in any of the three removed towns will on that date by operation of law pass to the town in which the real estate is situated. The new School Administrative District No. 3 is directed to assign the contracts of certain teachers to the three removed towns under certain conditions and in the manner set forth in Section 7 of the Act. Under Section 10 of the Act the bonds here in issue are in effect declared to be

the primary obligation of the new School Administrative District No. 3 but not of the three removed towns. Their liability upon these bonds is declared to be a contingent liability arising only in event of a default on said bonds and in the further event that a levy on all assets found in the new School Administrative District No. 3 is insufficient to pay said bonds in full. There are other and further provisions of the Act which need not here be recited or specifically referred to.

"It is at once obvious that if the Act goes into effect and is fully implemented, the exact contract which was entered into between School Administrative District No. 3 as originally constituted and the holders of these bonds will no longer exist. As one reasonable test of the accuracy of this statement it is interesting to note that the legal opinion which was issued in support of the validity and marketability of these bonds could no longer be given under the circumstances created by the Act. The certifying counsel made the following statements to which the following parenthetical comment may be made: 'Said bonds executed and certified as above indicated are valid and binding general obligations of School Administrative District No. 3 in the State of Maine.' (The reference here was to School Administrative District No. 3 as originally constituted which comprised the eleven named member towns. This would no longer be true). 'School Administrative District No. 3 is a body corporate and politic composed of the residents of and the territory within the Towns of Brooks, Freedom, Jackson, Knox, Liberty, Monroe, Montville, Thorndike, Troy, Unity and Waldo, in the County of Waldo, Maine, organized and existing under and pursuant to Ch. 221 of the Private and Special Laws of Maine, 1959, and to Sections 111-F to 111-U of Ch. 41 of the Revised Statutes of Maine, 1954, as amended.' (Same comment as above). 'The sums necessary to pay the interest on and the principal of said bonds are directed to be included in the budgeted expenses of

said School Administrative District, which expenses are annually apportioned among and assessed on the taxable polls and estate within said municipalities in accordance with Sec. 111-L of said Ch. 41, as amended, and the sums so apportioned and assessed are payable from ad valorem taxes which may be levied without limit as to rate or amount upon all the taxable property within the respective municipalities.' (The reference to 'said School Administrative District' is a reference to School Administrative District No. 3 as originally constituted. The reference to 'said municipalities' is a reference to the eleven towns which were then members of said district. The reference to 'all the taxable property within the respective municipalities' is a reference to the taxable property within the eleven member towns. If the Act becomes effective, this opinion would no longer be valid). 'The personal property of the residents of said School Administrative District and the real estate within its boundaries are ultimately liable to seizure on execution to satisfy the obligation of said District represented by said bonds.' (Here again the reference is to the residents of the eleven member towns and the real estate within their boundaries. This unconditional opinion would not be appropriate if the Act became effective since competent counsel would feel an obligation to set forth the clarifying condition stemming from the contingent liability imposed upon the three removed towns). I conclude that the implementation of Ch. 175 of P. & S. L. 1963 would substantially impair and in effect destroy the original contract legally entered into between School Administrative District No. 3 as originally constituted and the bond holders and would seek to substitute therefor a new and different contract between the new School Administrative District No. 3 created by the Act and the bond holders which would be substantially different as to terms and liability.

"It is interesting to note further that the very nature of School Administrative District No. 3 as

originally constituted itself rests upon contract —
a contract entered into pursuant to the provisions
of R. S. 1954, Ch. 41, as amended, by and between
the eleven member towns. This contract itself is
impaired by the implementation of the Act. It
may be further noted that there are outstanding
contracts entered into by School Administrative
District No. 3 as originally constituted with teach-
ers, persons furnishing transportation and other
services, all of which would be changed, altered
and impaired by the implementation of the Act."

- - - - - - - - - - "I have no difficulty in conclud-
ing that the presumption of the constitutionality
of Ch. 175 of P. & S. L. 1963 is overcome beyond
any reasonable doubt and that the Act must be
deemed unconstitutional."

- - - - - - - - - - "I find - - - - - Chapter 175 of
the Private and Special Laws of Maine, 1963, to
be violative of the provisions of the Constitution
of Maine and the Constitution of the United States
and to be null and void and of no force and effect."

- - - - - "It is contended that the Act is sever-
able and that at most only part of the implementa-
tion of the Act should be enjoined. I find that the
Legislature provided and intended to provide one
single plan for the removal and withdrawal of
three towns from the District and neither the plan
nor the Act is severable." - - - - -

Defendant-appellants by their statement of points on ap-
peal contest the court's rulings and findings:

that P. & S. L., 1963, c. 175 is violative of the Maine and
of the United States Constitutions and therefore a nullity;

that the bonds of the School District are valid or that the
plaintiffs are bondholders in due course;

that an implementation of such c. 175 would destroy the
preexisting contract of the School District with its bond-

holders, would substantially impair the contract or would substitute a new contract;

that an implementation of such c. 175 would impair preexisting contracts of the School District with teachers and persons furnishing transportation;

that amongst the School District and its 11 member groups and territories there was a preexisting contract which an implementation of such c. 175 would impair;

that such c. 175 dissolved the School District and created a new District of 8 member groups and territories;

that an implementation of such c. 175 would undermine and virtually destroy the credit and borrowing capacity of the School District and adversely affect such capacity of other Districts;

that such c. 175 is not severable.

That exclusion by the presiding justice of certain evidence submitted by defendants was also controverted by the appeal.

School Administrative Districts may be organized under the provisions of general law. R. S., c. 41, §§ 111-F to 111-U-1 inc.

A school administrative district is "a body corporate and politic" formed by the "residents of and the territory within 2 or more municipalities." R. S., c. 41, § 111-F. Such a district is "a quasi-municipal corporation within the meaning of chapter 90-A, section 23 and all the provisions of said section shall be applicable thereto." R. S., c. 41, § 111-K.

> "The personal property of the residents and the real estate within the boundaries of a municipality, village corporation or other quasi-municipal corporation may be taken to pay any debt due from the body corporate. The owner of the property so

taken may recover from the municipality or quasi-municipal corporation."
R. S., c. 90-A, § 23, as amended.

Once established a school district assumes the management and control of the public schools within its administrative district and becomes invested with title to all public school property necessary for its functions and located within its district. R. S., c. 41, § 111-H.

"All schools operated by school administrative districts when established shall be considered the official schools of the participating municipalities and all provisions of the general law relating to public education shall apply to said schools" - - - R. S., c. 41, § 111-M.

A school district for capital outlay purpose may issue bonds. R. S., c. 41, § 111-K. To procure money for the payment of principal and interest commitments of such bonds:

"- - - - - The directors (of the school district) shall thereupon issue their warrants, in substantially the same form as the warrant of the treasurer of state for taxes, to the assessors of each participating municipality, requiring them to assess upon the taxable polls and estates within said municipality an amount in proportion to the total sum required each year as that municipality's state valuation bears to the total state valuation of all the participating municipalities; and to commit the assessment to the constable or collector of said municipality who shall have all the authority and power to collect said taxes as is in him vested by law to collect state, county and municipal taxes."
- - - - - - - - - -
R. S., c. 41, § 111-L.

The general law makes provision for a new group and territory to join an existing school district and by vote of the groups for the dissolution of a school district which has no outstanding bonds or notes issued for capital outlay

purposes or debts of other specified natures. R. S., c. 41, § 111-P.

The general law ordains regular State grants to school districts in partial payment for the cost of construction of schools, for the support of schools and toward the satisfaction of principal and interest charges for capital outlay expenses. R. S., c. 41, §§ 237-D, E, G, H.

In 1958 the defendant, School Administrative District No. 3, became established under the general statutory law with 9 groups of residents of 9 municipal territories. In 1959 the Legislature by special emergency enactments provided a method for the addition to that School District of the residents and territories of the towns of Brooks and Jackson. P. & S. L., 1959, cc. 1, 2. By P. & S. L., 1959, c. 221 School Administrative District No. 3 with its elevenfold membership was specifically constituted retroactively and currently to subsist and function according to the provisions of R. S., c. 41, §§ 111-A through 111-U.

On June 10, 1963 School Administrative District No. 3 issued, sold and delivered its bonds. On June 13, 1963, to have effect September 21, 1963, the Legislature enacted P. & S. L., 1963, c. 175.

### P. & S. L., 1963, CHAPTER 175

This act contains several provisions of notability and moment in the case at bar.

S. A. D. #3 is "reorganized to comprise the Towns of Unity, Troy, Knox, Waldo, Thorndike, Montville, Freedom and Jackson. The Towns of Liberty, Brooks and Monroe are removed and withdrawn from School Administrative District No. 3 as previously constituted and from the effective date of this act shall revert to their prior status as independent municipalities for all school and educational purposes, with all rights and powers and subject to all the

duties and liabilities of municipalities pertaining to education." (Sec. 1)

The towns comprising S. A. D. #3 as "reorganized" are constituted "to be a School Administrative District, known as School Administrative District No. 3, with all the powers, privileges and franchises granted" according to R. S., c. 41, §§ 111-A to 111-U, as amended. "The proceedings taken in town meetings of the towns comprising said district as reorganized, including the election of the present directors of said towns," are "validated, confirmed and made effective as if said proceedings had been taken in connection with said district as herein reorganized - - - - -" (Sec. 2)

Responsibility for the education of pupils in Liberty, Brooks and Monroe was returned to those municipalities. (Sec. 4)

Title to school properties of S. A. D. #3 located in the 3 municipalities of Liberty, Brooks and Monroe is conferred upon those 3 towns and certain distributions and adjustments are prescribed to consummate a fair severance. (Sec. 6)

The school committees of Liberty, Brooks and Monroe are to determine the number of teachers required for the ensuing year. Thereupon S. A. D. #3 is to assign to those 3 disjoined towns the contracts of teachers who presently are under contract with S. A. D. #3 in teaching positions in the 3 towns but whose services will no longer be required by S. A. D. #3. The 3 towns are to honor the assigned contracts. A teacher so transferred may decline the continuation of the contract which shall thereupon terminate. (Sec. 7)

Section 10 of P. & S. L., 1963, c. 175, we quote verbatim:

"The prior action relative to school construction and the issuance of $730,000 in bonds or notes is

hereby declared to be valid and effective, any provisions of the law to the contrary notwithstanding, and any bonds or notes issued thereunder are hereby deemed to be a valid and binding indebtedness of School Administrative District No. 3 as herein reorganized, provided however that said bonds or notes shall in no way be construed as an indebtedness or liability of any of the Towns of Liberty, Brooks or Monroe, except as a contingent liability in the event of default on said bonds or notes in payment in full of the same is not made after levy on all of the assets of said School Administrative District No. 3, as hereby reconstituted, in accordance with the terms and conditions of said notes and bond indenture, and said contingent liability shall be in the same proportion as it would have been had the Towns of Liberty, Brooks and Monroe remained within School Administrative District No. 3 prior to its reorganization."

If S. A. D. #3 and the 3 separated towns cannot agree as to the redistribution of properties, the assignment of teaching contracts or other matters of severance provision is made for arbitration to be heard upon commission of the Chief Justice by a Justice of the Supreme or Superior Court who shall determine the matters finally in an equitable and just manner in keeping with the intents and purposes of P. & S. L., 1963, c. 175. The Maine Rules of Civil Procedure will not be applicable to the arbitration but the presiding justice may avail himself of appropriate rules and may effect the attendance of witnesses and the production of evidence. (Sec. 11)

The burden of establishing the unconstitutionality of a legislative act is full-laden.

" - - - - Certain canons of construction are so well established that they need only be referred to without prolonged discussion:—

" - - - - The wisdom, reasonableness and expediency of statutes and whether they are required by

the public welfare are subject to exclusive and final determination by the law making power. As to these matters the courts have no duty and no responsibility. - - - -

"- - - - Legislative power is measured not by grant, but by limitation. It is absolute and all-embracing, except as expressly or by necessary implication limited by the constitution. - - - -

"- - - - The court will pronounce invalid only those 'statutes that are clearly and conclusively shown to be in conflict with the organic law.'
*State* v. *Rogers*, 95 Me. 98.

"- - - - 'If a statute is susceptible or (of) two interpretations, and one of the interpretations will render the statute unconstitutional, and the other will not, the latter should be adopted.' *State* v. *Intoxicating Liquors*, 80 Me. 62.
*Hamilton* v. *District*, 120 Me. 15, 20.

"In passing upon the constitutionality of any act of the Legislature the court assumes that the Legislature acted with knowledge of constitutional restrictions, and that the Legislature honestly believed that it was acting within its rights, duties and powers. All acts of the Legislature are presumed to be constitutional, and this is 'a presumption of great strength' - - - - The burden is upon him who claims that the act is unconstitutional to show its unconstitutionality - - - - . Whether the enactment of the law is wise or not, and whether it is the best means to achieve the desired result are matters for the Legislature and not for the court. - - - -"
*Baxter* v. *Sewerage District*, 146 Me. 211, 214.

See, *Eames* v. *Savage*, 77 Me. 212, 216.

"- - - - But it may be the duty of the court to pronounce invalid an act which violates an express mandate of the constitution, even if the act is expedient and has been determined by the Legislature to be necessary."
*Randall* v. *Patch*, 118 Me. 303, 306.

The Legislature retains the prerogative of amending, altering or repealing the charters of corporations created by special act or by general statute. R. S., c. 53, §§ 1, 2.

> "Acts of incorporation passed since March 17, 1831 may be amended, altered or repealed by the legislature, as if express provision therefor were made in them unless they contain an express limitation; but this section shall not deprive the courts of any power which they have at common law over a corporation or its officers."
> R. S., c. 53, § 2.

The *Maine Constitution, Article VIII*, has vested in the Legislature the general control of public schools.

> "The Constitution of Maine, Art. VIII imposes the duty upon the Legislature to promote the cause of education. This, in effect, is in the nature of a constitutional mandate. In 1876 the then members of the Law Court of Maine had occasion to give their opinion relating to the authority and responsibility of the Legislature on the subject matter of schools and education, The *Opinion of the Justices* is recorded in 68 Me. 582. A pertinent quotation from the opinion is in the following language:
>
> 'In the constitution, it is declared that a general diffusion of education is essential to the preservation of the liberties of the people. By its very language, it would seem that the 'general diffusion of education' was to be regarded as especially a 'benefit' to the people. If so, then the legislature has *'full power'* over the subject matter of schools and of education to make all reasonable laws in reference thereto for the 'benefit of the people of this state.' (Emphasis ours.)
>
> 'In further support of the fact that the sovereign has maintained control of schools and education through the years is the following statement by the justices in their opinion:
>
> "Accordingly, from the first institution of the government to the present day, *the general control of*

*schools,* and the determination of what shall be a suitable provision by the towns for their support, has been fixed by legislative enactment.' (Emphasis ours.)"
*Squires* v. *Augusta,* 155 Me. 151, 155.

This court in *Shaw* v. *Small,* 124 Me. 36, 40, said:

"Eminent courts hold that statutes relating to public schools should receive a liberal construction in aid of their dominant purpose which is universal elementary education. - - - -"

The public school district is in a very true sense a contingent creature of the legislative will.

"A school district is a public agency or trustee established to carry out the policy of the State to educate its youth. The Legislature may change such agencies, and control and direct what shall be done with school property. - - - - A municipal corporation owes its existence to the legislative will - - - The Legislature may, in its discretion, abolish or dissolve such a corporation at any time - - - - Municipal corporations, organized for different purposes may include the same territory, as a city and a county, or a school district. - - - -

"The property held by such school districts for public use is subject to such disposition in the promotion of the objects for which it is held, as the supreme legislative power may see fit to make.
*Rawson* v. *Spencer,* 113 Mass. 40.

"Over property acquired and held exclusively by an agency of State government for purposes deemed public, the Legislature may exercise control to the extent of requiring the agency, without receiving compensation, to transfer such property to some other governmental agency, to be used for similar purposes, or perhaps for other purposes strictly public in their character.
*Mount Hope Cemetery* v. *Boston,* 158 Mass. 509, 33 N. E. 695.

"School property is public property, the property of the incorporated district and not of the taxpayers residing within it. - - - -

"The Maine Legislature, with regard to incorporating corporations purely public, is of virtually unlimited power. - - - -
*Kelley* v. *School District,* 134 Me. 414.

"The Legislature, as we have indicated, has the authority to create School Administrative Districts directly by its own act without the intervening services of an administrative body. There is no requirement under the Constitution of Maine for the submission of the question of formation of a School Administrative District to popular vote in the municipalities within the proposed District. There is no constitutional obligation to give this measure of home rule to the people of the communities involved. - - - -

"We have seen that the Legislature could have created this or any other School Administrative District by special act. - - - -

"The controlling principle is stated as follows:

'A school district, being an auxiliary of the state for purposes of education, the legislature may provide for its creation, control, and regulation, without violating the due process guaranty, with respect to the property rights of the district or of property owners therein.'
*16 A C. J. S., Constitutional Law,* § 604 (b).

"The interest of the taxpaying inhabitants in the creation and establishment of a school district is not a property interest - - - - "
*McGary* v. *Barrows,* 156 Me. 250.

"The law is now well settled that 'in respect to public corporations which exist only for public purposes, as counties, cities and towns, the Legislature, under proper limitations, have a right to change, modify, enlarge or restrain them, securing,

however, the property for the uses of those for whom it was purchased.' - - - - And the reason why this power exists, is, because the Acts by which such corporations are created are not contracts within the meaning of the constitution of the United States, or of the constitution of this State. The public good evidently requires that such corporations should be subject to legislative control. The Legislature, therefore, as the trustee of the public interests, is properly invested with unrestrained power over the existence of all public corporations."

*North Yarmouth* v. *Skillings*, 45 Me. 133, 141.

In the case at bar the presiding justice ruled that P. & S. L., 1963, c. 175 "in effect dissolves School Administrative District No. 3 as originally constituted, removes and withdraws the Towns of Liberty, Brooks and Monroe therefrom, and constitutes and establishes a new School Administrative District No. 3 comprising territorially only the eight remaining towns."

In this ruling we do not concur. The 1963 private act employs the words, "reorganized," "hereby constitute," reorganization," "reconstituted," "redistribution of property." Those terms when read in the full statutory context do not connote a dissolution of an existent corporate entity and the creation of one new and distinct. The act in its contemplated and projected effect undertakes no more than to partition 3 of the 11 groups into a school supervisory union and to conserve the residual 8 groups in the extant corporate District. To rule otherwise is to multiply difficulties without sufficient reason. The act discloses a purpose to assure the outstanding and abiding bond issue by protective expedients. Such an objective becomes unnecessarily complicated if we are to conclude that the Legislature purposed to establish a novel District and interpose it in replacement for the original obligor of the bonds. The act, to the contrary, manifests an intent to preserve the status

of the bond issue as an abiding and adequately secured obligation of the original obligor District while, in the same operation, neutralizing such resultants of the membership fracture as diminution of population and territory, affected teacher relations, State subsidies and reinvestiture of property previously contributed by the 3 severed groups.

It is quite significant that P. & S. L., 1963, c. 175, § 2 "validates, confirms and makes effective" the proceedings previously taken in town meetings of the 8 groups and territories remaining in the reorganized District" as if said proceedings had been taken in connection with said district as herein reorganized." The 1963 act also retains the same directors for such 8 groups without necessity of reelection.

Certain established principles of law appertain here to interpretation of P. & S. L., 1963, c. 175 conjointly with P. & S. L., 1959, c. 221.

In *Eden* v. *Southwest Harbor*, 108 Me. 489, 494 we find quoted with approval:

" 'As laws are presumed to be passed with deliberation and with a full knowledge of all existing ones on the same subject, it is but reasonable to conclude that the legislature in passing a statute, did not intend to interfere with or abrogate any former law relating to the same matter unless the repugnancy between the two is irreconcilable.' "

The following extracts from *Mobile* v. *Watson*, 116 U. S. 289, 300, quite palliate the significance of reflection as to whether P. & S. L., 1963, c. 175 creates a new or continues an existing quasi-municipal District.

"Whether the legislature of a State has given a local community, living within designated boundaries, a municipal corporation, and by a subsequent act or series of acts repeals its charter and dissolves the corporation, and incorporates substantially the same people as a municipal body under a new name

for the same general purpose, and the great mass of the taxable property of the old corporation is included within the limits of the new, and the property of the old corporation used for public purposes is transferred without consideration to the new corporation for the same public uses, the latter, notwithstanding a great reduction of its corporate limits, is the successor in law of the former, and liable for its debts; and if any part of the creditors of the old corporation are left without provision for the payment of their claims, they can enforce satisfaction out of the new - - - - - -

"So in *Broughton* v. *Pensacola,* 93 U. S., 266, 270 it was said by Mr. Justice Field, in delivering judgment, that when 'a new form is given to an old corporation, or such a corporation is reorganized under a new charter, taking in its new organization the place of the old one, embracing substantially the same corporators and the same territory, it will be presumed that the legislature intended a continued existence of the same corporation, although different powers are possessed under the new charter and different officers administer its affairs, and in the absence of express provision for their payment otherwise, it will also be presumed in such case that the legislature intended that the liabilities as well as the rights of property of the corporation in its old form should accompany the corporation in its reorganization.'

"In *O'Connor* v. *Memphis,* 6 Lea, 730, the Supreme Court of Tennessee went so far as to say that — 'Neither the repeal of the charter of a municipal corporation, nor a change of its name, nor an increase or diminution of its territory or population, nor a change in the mode of government, nor all of these combined, will destroy the identity, continuity, or succession of the corporation if the people and territory reincorporated constitute an integral part of the corporation abolished - - - - - The corporators and the territory are the essential

constituents of the corporation, and its rights and liabilities naturally adhere to them.' "

See, also, *Shapleigh* v. *San Angelo,* 167 U. S. 646, 654.

The defense impugns the validity of the School District bonds and the status of the plaintiffs as holders in due course of such of those bonds as they own. The presiding justice with ample evidence to sustain him has ruled that the bonds are valid and that the plaintiffs are holders in due course of their bonds. An obvious minor and clerical error inadvertently included in the opinion of the counsel who approved the legality of the bond issue is innocuous and irrelevant.

Plaintiffs' gravamen, in their accusation of unconstitutionality against P. & S. L., 1963, c. 175, is that the Legislature by that act would invalidly debase the security and resources for payment of the obligations of the preexisting bonds of School Administrative District No. 3.

R. S., c. 41, § 111-L prescribed that funds "for payment of bonds falling due and interest thereon" be procured by taxation of the polls and estates within the member groups and municipal territories. Such a prime sanction together with the summary access to the "personal property of the residents and the real estate within the boundaries of a - - - quasi-municipal corporation" granted by R. S., c. 90-A, § 23, as amended, produced sound security for a bond issue of judicious magnitude.

P. & S. L., 1963, c. 175 subsequent in time of passage and in effect to the School District bond issue would alienate 3 of the member groups and territories with a resultant loss to the District in property valuation and support to the extent of an indicated one third. The outstanding bonds would be validated but would cease to be an indebtedness or liability to the residents and territory of the 3 disjoined

members "except as a contingent liability in the event of default on said bonds or notes in (if) payment in full of the same is not made after levy on all of the assets of said School Administrative District No. 3 - - - - and said contingent liability shall be in the same proportion as it would have been had" the 3 released members remained in the School District.

It is noteworthy that the liability of the 8 remaining District members will continue to be primary as to the bonds but the responsibility of the 3 partitioned members will become insulated as a stand — by obligation enforcible only in the event of an unsatisfied balance of the bond indebtedness yet unpaid in the wake of levy by the bond creditors upon all the assets of the reconstituted School District.

Plaintiffs protest that implemented P. & S. L., 1963, c. 175, therefore, would substantially and unconstitutionally impair the obligation of the contract made by School Administrative District No. 3 with its bondholders.

"The result arrived at in all the decisions, bearing upon this question, seems to be that the legislature may alter or vary existing remedies, provided that in so doing, their nature and extent is not so changed as materially to impair the rights and interests of parties to existing contracts."
*Phinney* v. *Phinney,* 81 Me. 450, 462.

The constitutional prohibitions are as follows:

"The legislature shall pass no bill of attainder, ex post facto law, nor law impairing the obligation of contracts, - - - - "
*Constitution of Maine,* Article 1, Section 11.

"No state shall - - - pass any - - - law impairing the obligation of contracts, - - - - "
*Constitution of the United States,* Article 1, Section 10.

"- - - - By the obligation of a contract is meant the means which, at the time of its creation, the law affords for its enforcement - - - -"
*Nelson* v. *St. Martin's Parish*, 111 U. S. 716, 720.

The obligation of a contract is:

"- - - - the law which binds the parties to perform their agreement."
*Ogden* v. *Saunders*, 12 Wheat. 213, 257.

"- - - - the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement - - - -"
*Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550.

When in 1963 the School District issued its bonds the State Constitution, decided cases and enacted statutes authenticated as unquestionable law the broad authority of the Legislature both as to public school education and as to the creation, modification and dissolution of quasi-municipal corporations and the full availability of the personal property of all residents and the real estate in the District for the payment of unsatisfied obligations of such public corporations.

The scope of the constitutional prohibition against the impairment of the obligation of contracts has in several respects been the subject of evolved and organic construction.

"- - - - we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula."
*Home Bldg. & L. Ass'n.* v. *Blaisdell*, 290 U. S. 398, 428.

Early court pronouncements were quite absolute:

> "The objection to a law on the ground of its impair-
> ing the obligation of a contract, can never depend
> upon the extent of the change which the law effects
> in it.  Any deviation from its terms, by postpon-
> ing, or accelerating, the period of performance
> which it prescribes, imposing conditions not ex-
> pressed in the contract, or dispensing with the per-
> formance of those which are, however minute, or
> apparently immaterial, in their effect upon the con-
> tract of the parties, impairs its obligation - - - -
> *Green* v. *Biddle*, 8 Wheat. 1, 84.

> "One of the tests that a contract has been impaired
> is, that its value has by legislation, been dimin-
> ished.  It is not, by the Constitution, to be im-
> paired at all - - - -"
> *Planters' Bank* v. *Sharp*, 6 Howard, 301, 327.

"Unescapable problems" of construction arose and one of
them was:

> " - - - - What residuum of power is still in the
> States in relation to the operation of contracts, to
> protect the vital interests of the community?
> Questions of this character, 'of no small nicety and
> intricacy, have vexed the legislative halls, as well
> as the judicial tribunals, with an uncounted va-
> riety and frequency of litigation and speculation'
> Story on the Constitution, § 1375."

> " - - - - Not only is the constitutional provision
> qualified by the measure of control which the State
> retains over remedial processes, but the State also
> continues to possess authority to safeguard the
> vital interests of its people.  - - - - Not only are
> existing laws read into contracts in order to fix
> obligations as between the parties, but the reser-
> vation of essential attributes of sovereign power is
> also read into contracts as a postulate of the legal
> order.  The policy of protecting contracts against
> impairment presupposes the maintenance of a gov-
> ernment by virtue of which contractual relations

are worth while, — a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.

" - - - - Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other - - - -

" - - - - Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."
*Home Bldg. & L. Ass'n.* v. *Blaisdell,* 290 U. S. 398, 429, 434, 439, 447.

" - - - - And although a new remedy may be deemed less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional. Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract."
*Bronson* v. *Kinzie,* 1 How 311, 316. (1843)

"If a particular form of proceeding is prohibited, and another is left or is provided which affords an effective and reasonable mode of enforcing the right, the obligation of the contract is not impaired. - - - -

"The rule seems to be that in modes of proceeding and of forms to enforce the contract the legislature has the control, and may enlarge, limit, or alter them, provided that it does not deny a remedy, or so embarrass it with conditions and restrictions

as seriously to impair the value of the right
- - - -"

*Tennessee* v. *Sneed* (1877), 96 U. S. 69, 74.

In 1886 the United States Supreme Court said in *Mobile* v. *Watson*, 116 U. S. 289, 305:

"Therefore the remedies for the enforcement of such obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or, if they are changed, a substantial equivalent must be provided. When the resources for the payment of the bonds of a municipal corporation is the power of taxation existing when the bonds were issued, *any law which withdraws or limits the taxing power and leaves no adequate means for the payment of the bonds is forbidden by the Constitution of the United States, and is null and void* - - - -"
(Italics supplied.)

The highest court in *Hubert* v. *New Orleans* (1909), 215 U. S. 170, 178 observed:

"- - - - The power of taxation conferred by law entered into the obligation of the contracts, and any subsequent legislation withdrawing or lessening such power, *leaving the creditors without adequate means of satisfaction,* impaired the obligation of their contracts within the meaning of the Constitution - - - -" (Emphasis added.)

In *Richmond Mortg. & L. Corp.* v. *Wachovia Bk. & T. Co.* (1937), 300 U. S. 124, 128, we find:

"- - - - The particular remedy existing at the date of the contract may be altogether abrogated if another equally effective for the enforcement of the obligation remains or is substituted for the one taken away. The matter in dispute is whether the questioned enactment falls beyond the boundary of permissible regulation of the remedy for enforcement of appellant's contract."

This court commented in *Phinney* v. *Phinney*, 81 Me. 450, 462:

> "The rule, while somewhat vague and unsatisfactory, is the most certain general one of which the nature of the subject admits. The difficulty arises in its application to particular cases, and distinguishing between what are legitimate changes of remedy and those which impair the obligation of contract. Every case must be determined, in a great degree, by its own circumstances."

Mr. Justice Holmes supplies a caveat in reverse order in *Hudson Water Co.* v *McCarter*, 209 U. S. 349, 347:

> "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter."

R. S., c. 90-A, § 23, the statute subjecting the personal property of residents and the real estate situated in a quasi-municipal corporation to payment of unsatisfied corporate debts, has a root in antiquity and is indigenous both to England and to New England. *Eames* v. *Savage* (1885), 77 Me. 212, declared the statute in essential principle to be constitutional. The opinion contains impressive erudition of the historical statutory remedy. We quote selectively:
P. 216.

> "The statute itself, in this case, has existed for half a century, since February 27, 1833, (See P. L. 1833, Chap. DLXXXVI, Sec. 3), but it introduced no new principle or rule in the jurisprudence of this state. It merely affirmed a well known custom or law that had long before existed. The practice of bringing suits against a political division, or municipal organization, and collecting the judgment from the individuals comprising it, is believed to have existed in England, and to have been brought thence to New England. Actions against 'the hundred', were known as far back as Edw. 1.

Stat. 13, Edw. 1, c. 2; 3 Comyn's Dig. Hundred, c. 2. As 'the hundred' had no property, except that of individuals, the judgments must have been collected from the individuals. In *Russell* v. *Men of Devon*, 2 T. R. 667, Lord Kenyon said, that indictments against counties were sanctioned by the common law, though they would be levied on the men of the county - - - - In New England, the practice obtained from the earliest times, without any statute - - - - The practice has been regarded as settled law in Massachusetts, and has been repeatedly alluded to in the opinions of the courts, as sanctioned by immemorial usage. (cases cited) - - - - The people of Maine, while a part of Massachusetts, were familiar with the law and the practice. The Maine courts have repeatedly recognized it as long established, and as in harmony with the state constitution - - - - In Connecticut also, the antiquity and constitutionality of the law have been repeatedly affirmed.

P. 218.

" - - - - Towns, however, are not full corporations. They have no capital stock, and no shares. They are only quasi corporations — created solely for political and municipal purposes, and given a quasi corporate character for convenience only. They remain still an aggregation of individuals dwelling within certain territorial limits, and under the direct jurisdiction of the legislature."

In 1937 a proposed amendment to the Constitution of Massachusetts was worded as follows:

"No taxes on real estate shall in any year be levied, assessed or collected in an amount greater than two and one-half per cent of the fair cash value."

The legislature of Massachusetts sought the opinion of the Massachusetts Supreme Judicial Court to determine whether the amendment if adopted would constitute a law impairing the obligation of contracts in violation of the contractual rights of bondholders of Massachusetts municipal

bonds issued prior to the adoption as law of the proposed amendment. *Opinion of the Justices,* 297 Mass. 582, 9 N. E. (2nd) 189 contains the determination of the individual justices who cited *Mobile* v. *Watson, supra,* 305, *Louisiana* v. *New Orleans,* 102 U. S. 105, 113 and *Thompson* v. *Auditor General,* 261 Mich. 624, 640 and concluded as follows:

"If the sole remedy of the creditors holding evidences of indebtedness issued by cities and towns within this Commonwealth were the revenue to be derived from taxation, there would be grave doubt about the constitutionality of the proposed amendment. It is not inconceivable that the financial condition of some cities and towns in the Commonwealth may be such as to require drastic legislation for their regulation and protection - - - But the remedy of creditors of municipalities in Massachusetts is not restricted to revenue derived from taxation. 'By the common law of Massachusetts and of other New England States, derived from immemorial usage, the estate of any inhabitant of a county, town, territorial parish or school district, is liable to be taken on execution on a judgment against the corporation.' *Hill v. Boston,* 122 Mass. 344, 349 - 350 - - - - - We assume that this remedy is also available to creditors of cities as well as of towns. *Nichols v Ansonia,* 81 Conn. 229, 235, 236. Therefore the remedy of a creditor of a municipality in Massachusetts is reinforced by the right to levy an execution issued on a judgment in his favor on the real estate of any person within such city or town. The right to sell such real estate on execution may not be in all respects so convenient as collection from a town or city treasurer. It cannot, however, be regarded as the impairment of the obligation of a contract to reduce the amount assessable upon real estate for purposes of taxation to a point where it may be necessary to resort to the remedy."

(See, also, Notes and Comments, *18 Boston University Law Review,* 185.)

We are mindful that opinions of the Justices of the Supreme Judicial Court of Massachusetts (Constitution of Massachusetts, Art. 11, Chap. 111) are advisory, are not binding adjudications (*Boston* v. *Treasurer,* 237 Mass. 403, 130 N. E. 390) and state individual views. (*Lynn* v. *Commissioner,* 269 Mass. 410, 169 N. E. 502, 503.) But such an opinion rendered after judicial investigation and deliberation by the members of a court always so greatly esteemed is very ponderable and especially so because of the grave social and financial consequences attendant upon an answer to such a serious question as that propounded to the justices in 1937.

In the case at bar there can be no doubt that the plaintiff bondholders have an available and very substantial remedy in any default, against the goods and chattels of the residents of and against the real estate in, 8 remaining and 3 removed territories of School District No. 3. R. S., c. 90-A, § 23, c. 118, §§ 30, 31, 32, as amended; *Crafts* v. *Elliottsville,* 47 Me. 141; *Spencer* v. *Brighton,* 49 Me. 326, 329; *Hayford* v. *Everett,* 68 Me. 505, 507; *Littlefield* v. *Greenfield,* 69 Me. 86, 89; *Caldwell* v. *Blake,* 69 Me. 458, 467; *Paul* v. *Huse,* 112 Me. 449, 451.

To the extent of more than $600,000 the proceeds of the School District bond sale will be applied in the construction of a new high school at Thorndike a group and territory remaining in the District after the legislative partition.

For the 11 towns hitherto encompassing the inhabitants and the territories of the School District the State valuation of 1963-64 is an aggregate $6,640,000. R. S., c. 16, § 67, as amended. The State valuation for the 3 removed towns inclusively is $2,250,000 or approximately 1/3rd of the composite State valuation for the District. The valuation for the 8 retained towns totals $4,390,000. Despite the provisions of P. & S. L., 1963, c. 175, therefore, against a bonded indebtedness of $730,000, there will remain in the 8

towns a primary security of $4,390,000 and in the 3 released towns a contingently additive security of $2,250,000 more. P. & S. L., 1963, c. 175, § 10.

In 1963 the 3 removed members of the School District were obligated to pay some 34% of the total of the operational budget. However, those members coincidentally with their separation from the District will relieve the latter from the operational cost of educating some 480 pupils, save for bond and other fixed charges.

In the bond repayment schedule the 3 disjoined units, after State subsidy, would be chargeable with the responsibility for 34% of the remaining annual cost of the 11 unit District. In the 8 unit District such expense will be reapportioned for each member. After State contribution the first year's bond charge to be borne by the combined 3 retiring units is $8,722.48. That amount and the progressively diminishing sums for succeeding years would be equitably assimilated amongst the 8 abiding units. For the 11 unit District the State aid is presently calculated at 58% of the bond repayment. That percentage will be subject to some variation by formula for the 8 unit District. R. S., c. 41, § 237-H, as amended.

Because of the circumstances of the instant case plaintiffs' protest of impairment of the obligation of contract can not generate a merely abstract issue or insist upon the benefits of an absolute. On the other hand there are to be seen here "the unescapable problems of construction." *Home Bldg. & L. Ass'n.* v. *Blaisdell, supra,* 429. There are the constitutional prohibitions against impairment. But they may be qualified by the authority retained by a State for the safeguarding of the vital interests of the people. We are charged here with judging whether the legislative act P. & S. L., 1963, c. 175 yielded a legitimate change of remedy or an invalid impairment of a contract. In 1963 in Maine the possession and reservation of sovereign au-

thority in the promotion of public school education and in the creation, alteration and dissolution of public, quasi-municipal corporations were "essential attributes of sovereign power" to be read into contracts "as a postulate of the legal order" *Id., supra,* 434. So to be read, also, was the existing law of access for unpaid creditors of defaulting public quasi-municipal corporations to levy upon the personal property of residents and the territorial real estate of such public corporations.

> " - - - - The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, — a government which retains adequate authority to secure the peace and good order of society - - - - "
>
> *Home Bldg. & L. Ass'n.* v. *Blaisdell, supra,* 434.

The Legislature by its act of 1963 partially curtailed the reach of the property taxation device which it had previously made adaptable for School District bond repayment but continued unaffected the limitless rate and amount of such taxation.

Although the District no longer may initiate and direct a tax upon the assessable properties within the 3 eliminated territories, nevertheless it may still put in requisition through its directors an ad valorem tax without limit as to rate or amount and upon a tax base of $4,390,000 of property, state appraised and accessible, in the 8 retained towns of the School District R. S., c. 41, § 111-L. With this power of taxation are all the collection and forfeiture processes of R. S., c. 91-A, as amended. And such plenary taxing potential preserved in the 1963 Act by the Legislature for the satisfaction of the bonded debt of the District is not by any means an exclusive resource but coexisting with it is continued the both complementary and auxiliary right of levy by execution after default in payment. R. S., c. 90-A, § 23. The right of levy is modified into primary and secondary orders but is otherwise legally persistent.

It is true that the initial bond, principal debt is $730,000 with annual interest of 3.6%. Yet the annual bond payments of interest and principal through the 20 years range downward from $61,250 to a last annual payment of $31,080. Of these annual payments the State will supply a large portion. The State would pay 58% of these annual charges for the 11 member district. The record in this case, after State subsidy contribution, lists the annual principal and interest costs to the 8 member districts as ranging downward through the 20 years from $24,512, the first year to a sum of $12,432 the twentieth year. The largest payment for any of the 8 districts the first year is $8,655; the smallest payment for any of the 8 districts the first year is $1,563; an average per district of $3,064.

The largest payment for any of the 8 districts the 20th year is $4,389; the smallest payment, that year is $793; an average per district of $1,554.

Under such circumstances future travail and delay for unpaid bondholders are possible but not demonstrably probable and surely not of sufficient gravity to arrest and suspend the State's police and welfare power and to justify the invalidation of the legislative act. *Mobile* v. *Watson, supra.*

The presiding justice in his decision incidentally ruled that:

> " - - - - the very nature of School Administrative District No. 3 as originally constituted itself rests upon contract — a contract entered into pursuant to the provisions of R. S. 1954, Ch. 41, as amended, by and between the eleven member towns. This contract itself is impaired by the implementation of the Act. - - - "

In *North Yarmouth* v. *Skillings*, 45 Me. 133, 141, this court said:

> "The law is now well settled that, 'in respect to public corporations which exist only for public pur-

poses, as counties, cities, and towns, the Legislature, under proper limitations, have a right to change, modify, enlarge or restrain them, securing, however, the property for the uses of those for whom it was purchased.' - - - - ; and such has been the uniform practice of the Legislature of this State, from its earliest existence. And the reason why this power exists, is, because the Acts by which such corporations are created are not contracts within the meaning of the constitution of the United States, or of the constitution of this State. The public good evidently requires that such corporations should be subject to legislative control. The Legislature, therefore, as the trustee of the public interests, is properly invested with unrestrained power over the existence of all public corporations."

The effect of the implementation of P. & S. L., 1963, c. 175 upon the value and marketability of the bonds issued and upon the credit and borrowing capacity of School District No. 3 and those of other School Districts in Maine, if susceptible of dependable demonstration, has not been established in the record of this case.

The presiding justice properly refused to admit evidence of an injunction previously issued by the Superior Court in an action tried prior to the instant case. The presiding justice for sufficient reason ruled that the defendants-appellants had waived their right to present such evidence. Intervening events between the imposition of the injunction and the trial in this case had patently rendered the injunction of no probative effect in this action.

School Administrative District No. 3 as defendant in the case at bar filed a cross claim challenging the constitutionality of P. & S. L., 1963, c. 175, § 11 in so far as that statutory section provided a mode of arbitration and special rules governing it in the event of a failure of the members of the School District to agree upon certain adjustments oc-

casioned by the severance from the School District of the 3 removed members. Because of the broad authority of the Legislature over public, quasi-municipal corporations and the transfer of their property for similar public purposes there can be no doubt that the legislative body may competently and validly ordain becoming rules of arbitration to effectuate the subsidiary details of its exercise of its authority. *Kelley* v. *School District,* 134 Me. 414, 420. Nor need the Legislature accord any right of appeal or review from the arbitration decision. *Sears, Roebuck & Co.* v. *Portland,* 144 Me. 250, 254.

P. & S. L., 1963, c. 175, § 7 in outline makes the following provisions. The School committees of the 3 removed towns are to determine the number of teachers they shall require for the ensuing year. School Administrative District No. 3 will thereupon assign to those 3 towns its contracts with teachers who are already teaching in the territory of the 3 towns but whose services will no longer be required by School Administrative District No. 3. Those 3 towns are to honor such assigned contracts. Any teacher so transferred may decline to continue his or her contract "whereupon said contract shall be deemed terminated and all rights, duties and liabilities of the parties shall cease."

In so far as such section 7 denies just damages to the teacher who declines to continue her compulsorily assigned contract under substituted employers that section impairs the obligation of any teacher contract entered into prior to June 13, 1963. The invalidity is severable. R. S., c. 10, § 22, XXVIIID; *Cole* v. *County Commissioners,* 78 Me. 532, 538.

With the exception of the specified invalidity occurring in Section 7 the evidence in the instant case does not sustain a ruling that P. & S. L., 1963, c. 175 is "clearly and conclusively - - - - in conflict with the organic law." *Hamilton* v. *District,* 120 Me. 15, 20.